UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TIQUAN DAVIS,

                    Plaintiff,

          -v-

CORRECTION OFFICER ANGELA JACKSON,
LIEUTENANT RICHARD DONAHUE,
LIEUTENANT V. GEORGE, SGT. GINAH
SHIBAH, LIEUTENANT O'CANA, CORRECTION
OFFICER T. GRANT, SGT. TODD PAROLINE, and
CORRECTION OFFICER RAYMOND L. ORTIZ,

                    Defendants.

Case No. 15-CV-5359 (KMK)

OPINION & ORDER

Appearances:

Tiquan Davis
Ossining, NY
*Pro Se Plaintiff*

Yan Fu, Esq.
New York State Attorney General
New York, NY
*Counsel for Defendants Correction Officer Angela Jackson, Lieutenant Richard Donahue, Lieutenant V. George, Sgt. Ginah Shibah, Lieutenant O'Cana, Correction Officer T. Grant, Sgt. Todd Paroline, and C.O. Raymond L. Ortiz*

KENNETH M. KARAS, District Judge:

        Tiquan Davis ("Plaintiff"), proceeding pro se, brings this Action against Correction

Officer Angela Jackson ("Jackson"), Correction Officer Raymond Ortiz ("Ortiz"), Sergeant

Ginah Shibah ("Shibah"), Lieutenant Richard Donahue ("Donahue"), Lieutenant V. George

("George"), Lieutenant John Doe O'Cana ("O'Cana"), Correction Officer T. Grant ("Grant"),

and Sergeant Todd Paroline ("Paroline") (collectively "Defendants"), employees of the New

York State Department of Correction and Community Supervision ("DOCCS"), pursuant to 42

U.S.C. § 1983.  (*See* Am. Compl. (Dkt. No. 65).)  Before the Court is Defendants' Motion to Dismiss.  (*See* Dkt. No. 77.)  For the reasons explained herein, Defendants' Motion To Dismiss is granted in part and denied in part.

<u>I.  Background</u>

<u>A.  Factual Background</u>

The following facts are collected from Plaintiff's Complaint and are, for purposes of this Motion, accepted as true.

<u>1.  The September 18, 2011 Incident</u>

Plaintiff is an inmate at Sing Sing Correctional Facility ("Sing Sing") and was previously an inmate at Southport Correctional Facility ("Southport").  (*See* Am. Compl.)  On September 18, 2011, Correction Officer Bonner ("Bonner") gave Plaintiff authorization to make his Inmate Liaison Committee ("I.L.C.") rounds on R&W Company in HBA-block, but, while he was making his "I.L.C. round" on R company, Jackson told Plaintiff to show his hands and, after he did so, to put his hands on the gate for a pat frisk.  (*See id.* ¶¶ 1–2.)  At that time, Bonner yelled to Jackson to "leave [Plaintiff] alone," to which Jackson responded by saying, "tell him to get the fuck off my Company."  (*Id.* ¶ 3.)  Plaintiff then turned to leave the company, but Jackson grabbed him by his sweater, and yelled, "[w]hat's all that you just dropped on the floor[?]"  (*Id.*)  Plaintiff, "in an attempt to stop . . . Jackson from grabbing him so roughly," grabbed Jackson's hands and told her to stop playing, at which time Correction Officers Sandiford and Grant grabbed Plaintiff from behind and took him to the ground without resistance from Plaintiff.  (*Id.* ¶ 4.)  While Plaintiff was being handcuffed, Shibah, the area supervisor, came and told Garcia to take Plaintiff to the shower on Q-Company and to take him to the hospital for a use of force examination.  (*See id.* ¶ 5.)

While Plaintiff was in the hospital, he met with his I.L.C. staff advisor, Sergeant Williams ("Williams"), who asked Plaintiff, "[h]ow the hell did you let a chick like Jackson catch you with weed[?]" (*Id.* ¶ 6.) Plaintiff at first thought Williams was kidding, but Williams said he was "dead serious," and said that Jackson claimed that Plaintiff came on the company with a handful of loose marijuana. (*Id.*) Plaintiff said he never had any marijuana on him, let alone loose in his hand, and posited that Jackson "set him up" because he had complained to the night block sergeant that Jackson had been preventing him from doing rounds on the company a few nights before. (*Id.* ¶ 7.) Photos were taken of Plaintiff, and he provided a written statement. (*See id.*) Afterwards, he was taken to the disciplinary office to provide a urine sample, which came back negative for drug use. (*See id.* ¶ 8.) Plaintiff was then brought to the HBC-SHU, and, while in the special housing unit (the "SHU"), he received a misbehavior report written by Jackson and authorized by Shibah on September 18, 2011, charging him with several rule violations, which he identifies as "106.10 (direct order), 115.10 (frisk), 100.11 (assault on staff), [and] 113.25 (drug possession)." (*Id.* ¶¶ 8–9.) Thereafter, a hearing was conducted by Officer Pinker, after which Plaintiff was found guilty of all of the charges except the frisk charge. (*See id.* ¶ 9.) Plaintiff was given a penalty of 24 months in the SHU and 24 months' loss of all other privileges, including recommended loss of good time. (*See id.*)

### 2. The October 20, 2011 Incident

On or about October 20, 2011, while in the SHU, Ortiz came to Plaintiff's cell and asked, "are you ready[?]" (*Id.*) Plaintiff responded, "no," and Ortiz then said, "you wanna play games[,] so now I'm going to play games." (*Id.* ¶ 10.) Ortiz then told another correction officer to turn off the water in Plaintiff's cell, and Ortiz said, "I'm going to play games this time, let's see you get around this one," and "I remember when you wrote my boy Perez up, we ain't forget

that." (*Id.* ¶¶ 10–11.)  Ortiz then ordered Plaintiff to urinate into two separate bottles, one of which Ortiz placed into his top pocket, and the other of which was placed in a cup with a lid on it.  (*See id.*)  As Ortiz was leaving, he said, "now I'm gonna show you how to play games." (*Id.* ¶ 11.)  Several hours later, Plaintiff received a misbehavior report written by Ortiz in which it was alleged that Plaintiff tested positive for drugs.  (*See id.*)

In connection with Plaintiff's October 20, 2011 misbehavior report, Plaintiff was provided with O'Cana as his "assistant" in the upcoming disciplinary proceeding.  (*Id.* ¶ 12.)  Plaintiff asked O'Cana to view the SHU audio and video from the HBC 2 gallery from October 20, 2011, for the hours of 11:45 AM to 1:26 PM, and to report the results back to Plaintiff because Plaintiff wanted the footage as evidence at his hearing.  (*See id.*)  Despite Plaintiff's request, O'Cana never viewed the footage, nor did he provide Plaintiff with a copy of the footage.  (*See id.*)

Subsequently, George—who, according to Plaintiff, works in the disciplinary office with Ortiz and who approved Plaintiff's urine test—served as hearing officer at the hearing for the October 20, 2011 incident ("George Hearing").  (*See id.* ¶ 13.)  Plaintiff objected to George's selection as the hearing officer on these grounds.  (*See id.*)  This objection was noted, but George continued on as the presiding hearing officer.  (*See id.*)  During the proceedings, Plaintiff requested, but was denied, access to certain witnesses and materials, including the SHU audio and video footage, his urologist, his kidney specialist, the nurse administrator and the mental health unit chief, and the drug-testing manual.  (*See id.* ¶ 14.)  Plaintiff was then found guilty and given as punishment 24 months in the SHU and 24 months' loss of all other privileges, including recommended loss of good time.  (*See id.* ¶ 15.)  In December 2011, Plaintiff was transferred

from Sing Sing to Southport, with a total of 48 months in the SHU and 48 months' loss of all other privileges, including recommended loss of good time. (*Id.* ¶ 16.)[1]

### 3. Plaintiff's Appeal and Rehearing

Plaintiff filed an administrative appeal challenging both proceedings and at least partially succeeded on each. (*See id.* ¶ 17.) On February 3, 2012, the Director of Special Housing (the "Director") modified the penalty imposed for Ortiz's misbehavior report and the hearing that resulted from it. (*See id.*) In so doing, he reduced the penalty from 24 months' time in the SHU to 18 months, but kept the remaining penalties in place. (*See id.*) Additionally, on February 7, 2012, the Director reversed the outcome hearing for the September 18, 2011 incident due to the absence of two witnesses and ordered a rehearing, which was conducted by Donahue and concluded on March 7, 2012. (*See id.* ¶ 18.) At the rehearing on March 7, 2012 ("Donahue Hearing"), Plaintiff was found guilty of all four charges, including the frisk charge, of which he had earlier been found not guilty. (*See id.* ¶ 21.) Plaintiff was then given 36 months in the SHU and 36 months' loss of all other privileges, a 12-month increase on both fronts from his earlier penalty. (*See id.*) According to Plaintiff, Donahue was biased in his determination, allegedly saying that he "d[id] not believe [Plaintiff]," and also "called him a nigger." (*Id.*) In response to this heightened penalty, Plaintiff filed an administrative appeal to the Director on March 17, 2012, and his SHU time was modified from 36 months back to 24. (*See id.* ¶ 22.)

---

[1] Though Plaintiff does not clarify this, given his allegation that he was sentenced to 48 months in SHU, it appears that the 24-month punishment given for the October 20, 2011 incident was to run concurrently with the 24-month term given in the hearing for the September 18, 2011 incident.

On March 20, 2014, Plaintiff was transferred back to Sing Sing.  (*See id.* ¶ 25.)  Upon his arrival, Plaintiff was sent to the very same cell block where the initial incident with Jackson occurred.  (*See id.* ¶ 26.)  Jackson saw Plaintiff, and said, "look who's back, Mr. Davis himself. Don't get comfortable here." (*Id.*)  Grant told other officers at Sing Sing that Plaintiff had assaulted Jackson previously, "because of that I.L.C. bullshit," and proceeded to file an allegedly false misbehavior report against Plaintiff charging him with several rule violations, which he identifies as "106.10 (direct order), 109.10 ([o]ut of place), and 104.13 (creating a disturbance)." (*Id.* ¶ 27.)  However, this misbehavior report was dismissed.[2]  (*See id.*)  On an unspecified date, Jackson searched his cell while Plaintiff was not present, though she found no contraband.  (*See id.* ¶ 28.)  However, Jackson later told the other inmates that Plaintiff had, "a makeshift sex toy in his cell," which led to harassment and threats against Plaintiff.  (*Id.*)

In May 2014, after being transferred to a new Block, Plaintiff was pulled out of a line, placed against the wall, and pat-frisked by Correction Officer Thor ("Thor").  (*See id.* ¶ 29.) When asked why he was being searched, Thor responded that he "hope[d] [Plaintiff] [was] not gonna write [him] up for this because [he] know[s] about [Plaintiff] and Jackson." (*Id.*)

Later, in June or July 2014, Plaintiff was taken by Ortiz to the disciplinary office.  (*See id.* ¶ 30.)  Upon his arrival, Plaintiff was "threaten[ed] and interrogated" by two unnamed Lieutenants about contraband found "in the chapel area where [P]laintiff had absolutely no access." (*Id.*)  During this interrogation, Plaintiff's cell was searched and he was ordered to submit to a urine test.  (*See id.*)  Lieutenant Werlau then told Plaintiff that he "kn[e]w about

---

[2] Plaintiff does not say when or why this report was dismissed, or who dismissed it.

[Plaintiff] and Jackson, so don't be writing a bunch of shit up around here . . . you know weapons can be found in your cell at any time." (*Id.*)

Plaintiff "explained the fear and anxiety he was experiencing," as a result of the threats made against him upon his return to Sing Sing to his mental health providers. (*Id.* ¶ 31.) At "every session" between March and November 2014, Plaintiff brought these fears up, and was informed by his mental health providers that they "would relay this to the Superintendent at their meetings." (*Id.*) On November 10, 2014, Plaintiff finally spoke with Superintendent Capra ("Capra") in the visiting room. (*See id.* ¶ 32.) Plaintiff told Capra about "the constant harassment, threats, and fear of being in Sing Sing if he wrote a grievance . . . or filed a [§] 1983 Complaint." (*Id.*) Capra informed Plaintiff that he had been made aware of these concerns through the mental health providers, and that he would not tolerate any abuse or retaliation. (*Id.*) Capra further assured Plaintiff that he may file any grievances or complaints without fear of retaliation, and restored Plaintiff's previously lost privileges as a show of good faith. (*See id.*) Although his privileges had been restored, Plaintiff continued to fear retaliation "to the point of depression," which resulted in him cutting his wrist and being placed on suicide watch for two days. (*Id.* ¶ 33.)

On or about August 4, 2015, roughly one month after the filing of this Action, Plaintiff was confronted by Paroline, who told Plaintiff that he "hear[d] [Plaintiff] like[d] suing people." (*Id.* ¶ 36.) Paroline ordered Plaintiff to remove his belt for examination, and proceeded to cut the belt and confiscate the buckle. (*See id.*) Before leaving, Paroline told Plaintiff to not "fuck with him because [he] [was] not going to like it." (*Id.*) After this incident, Plaintiff sought to speak with a mental health provider, but was instead escorted to the Psychiatric Satellite Unit (the "PSU") and placed on suicide watch based on a false report by Paroline that Plaintiff "was

suicidal." (*Id.* ¶ 37.)  Paroline also filed a misbehavior report charging plaintiff with, "181.10 (failure to comply with disciplinary disposition)." (*Id.* ¶ 38.)  Plaintiff was ultimately found not guilty following a hearing held on August 8, 2015. (*See id.*)  Having heard that Plaintiff had been found not guilty at his hearing, Paroline filed another misbehavior report on August 8, 2015, charging Plaintiff with the same offense as before. (*See id.* ¶ 39.)  The second misbehavior report was "reversed and expunged." (*Id.*)

Several months later, on October 31, 2015, Grant came to Plaintiff's cell and wrote up another allegedly false misbehavior report. (*See id.* ¶ 40.)  Plaintiff was charged with, "106.10 (disobeying a direct order) [and] 107.10 (obstructing visibility into the cell)." (*Id.*)  Plaintiff was eventually found not guilty of disobeying a direct order, though he does not allege whether he was found guilty of the second offense. (*See id.*)

### 5.  Article 78 Proceedings

Plaintiff has also filed two unsuccessful Article 78 proceedings challenging the hearings held before George and Donahue.  Plaintiff initiated the Article 78 proceedings regarding the George Hearing on April 9, 2012, (Decl. of Yan Fu, Esq., in Supp. of Mot. To Dismiss ("Fu Decl.") Ex. D ("Apr. 9 Davis Article 78 Petition") (Dkt. No. 79)), and then initiated the Article 78 proceedings regarding the Donahue Hearing on August 3, 2012, (Fu Decl. Ex. A ("Aug. 3 Davis Article 78 Petition")).[3]

---

[3] The Court properly takes judicial notice of the documents filed in Plaintiff's two Article 78 proceedings as matters of public record. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir. 1992) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (internal quotation marks omitted)); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings."); *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras,* No. 98-CV-3099, 2001 WL 300735, at *9 n.7 (S.D.N.Y. Mar. 27, 2001) ("With respect to materials from the [s]tate

### a. George Hearing Article 78 Proceedings

On April 9, 2012, Plaintiff brought an Article 78 proceeding in the New York Supreme Court, Westchester County on April 9, 2012, challenging the disciplinary action taken on November 18, 2011 in the George Hearing.  (Apr. 9 Davis Article 78 Petition ¶ 3.)  In his petition, Plaintiff alleged that George, "knowingly and intelligently deprived [Plaintiff] of [his] regulatory and constitutional right to present evidence [on] [his] behalf when [George] denied [him] video/audio evidence," (*id.* ¶ 12), and Plaintiff's right to access the "drug testing manual," (*id.* ¶ 16).  Plaintiff also alleged that George, "deprived [Plaintiff] of . . . [his] constitutional right to witnesses," when he denied him the opportunity to call his "urology and kidney specialist[s]," (*Id.* ¶ 11), as well as the Nurse Administrator and mental health unit chief as witnesses, (*id.* ¶ 13).  Plaintiff also directly challenged George's impartiality as a hearing officer, alleging that he was biased due to his direct involvement in the proceedings given that he "approved the urine test." (*Id.* ¶ 15.)  Finally, Plaintiff filed a reply to the State's response to his petition on September 17, 2012 reiterating these allegations and making additional factual arguments in support of his due process claims.  (*See* Fu Decl. Ex. E ("Sept. 17 Davis Article 78 Reply") at 1–2.)

The state court reviewed these allegations and held on December 20, 2012 that, "[t]he errors cited by [Plaintiff] [did] not constitute a denial of due process," and the court was not persuaded that Plaintiff "was improperly deprived of his right to call certain witnesses," as "denial of those witnesses was appropriate."  *Matter of Davis v. Fischer*, No. 200/12 at 3 (N.Y.

---

[c]ourt [a]ction, the [c]ourt may take judicial notice of the relevant pleadings, motion papers, orders, and judgments in the [s]tate [c]ourt [a]ction without converting [the] [d]efendant's motion to one for summary judgment.").

Sup. Ct. Dec. 20, 2012). Moreover, George's final decision was found to be "grounded in facts and evidence established at the hearing and . . . rationally based." *Id.* at 2.

### b. Donahue Hearing Article 78 Proceeding

On August 3, 2012, Plaintiff brought an Article 78 proceeding in the New York Supreme Court, Westchester County on August 3, 2012, challenging the results of the Donahue Hearing on March 7, 2012. (*See* Aug. 3 Davis Article 78 Petition ¶ 3.) In his petition, Plaintiff alleged that he was denied due process on the grounds that Donahue "deprived [him] of [his] constitutional right to witnesses when he denied C.O. Bonner and C.O. Jackson[] as [his] witnesses," (*id.* ¶ 10), that Donahue was "biased, partial, . . . [and] arbitrary and capricious," (*id.* ¶ 11), and that he was denied "effective assistance in violation of [New York law]," (*id.* ¶ 12).[4] Plaintiff also filed a reply to the State's response to his petition on November 8, 2012 reiterating these allegations and making additional factual arguments. (*See* Fu Decl. Ex. B. ("Nov. 8 Davis Article 78 Reply") at 1–2.)

On January 17, 2013, the state court dismissed the petition, specifically holding that, "[t]he record indicates that the testimony of the requested witnesses would not have been relevant to the issue of [Plaintiff's] guilt." *Matter of Davis v. Fischer*, No. 520/12 at 3 (N.Y. Sup. Ct. Jan. 17, 2013). Moreover, the state court found that Donahue's decision was rationally based, and that he was "not biased and did not deprive [Plaintiff] of effective assistance." *Id.*

---

[4] Plaintiff also submitted what he termed a "supplemental appeal," (Aug. 3 Davis Article 78 Petition ¶ 7), which was a letter brief submitted on Plaintiff's behalf during his administrative proceedings by Prisoners' Legal Services of New York. (*See id.* Ex. A.) This brief puts forth detailed legal argument regarding Donahue's alleged denial of due process based upon Plaintiff's inability to put forth certain witnesses. (*See id.* at unnumbered 3–4.)

B.  Procedural Background

On July 7, 2015, Plaintiff filed his Complaint, (*see* Compl. (Dkt. No. 2)), and sought leave to proceed in forma pauperis, (*see* Request to Proceed IFP (Dkt. No. 1)), which was granted on July 15, 2015, (*see* Order Granting IFP Status (Dkt. No. 4)).  On December 28, 2015, Defendants filed their Motion to Dismiss and accompanying papers.  (*See* Dkt. Nos. 22–27.)  After several extensions, Plaintiff filed his Opposition on June 7, 2016, (*see* Dkt. No. 33), and, on June 29, 2016, Defendants submitted their Reply, (*see* Dkt. No. 37).  Plaintiff submitted a surreply on July 22, 2016, (*see* Dkt. No. 41), and Defendants filed their own surreply and accompanying papers on September 13, 2016, (*see* Dkt. Nos. 48–50).

On September 30, 2016, the Court issued an Opinion and Order dismissing Plaintiff's official capacity claims and finding that Plaintiff's due process and retaliation claims were time-barred absent application of an applicable tolling doctrine.  (*See* Opinion & Order (Sept. 30, 2016) ("Sept. 30, 2016 Opinion") 10–11, 13, 16, 27–28 (Dkt. No. 52).)  The Court considered whether Plaintiff was entitled to equitable tolling, given Plaintiff's allegations that his fear of retaliation was an extraordinary circumstance warranting application of the doctrine.  (*See id.* at 20–26.)  Though the Court ultimately concluded that Plaintiff had shown the requisite extraordinary circumstances through his allegations of "specific facts showing that a reasonable fear of retaliation prevented [him] from filing a timely complaint," the Court found that there were insufficient facts to conclude that Plaintiff had "acted with reasonable diligence during the time he was facing a threat of retaliation."  (*Id.* at 26–27.)  However, given Plaintiff's pro se status, the Court granted leave to amend to allege sufficient facts related to both his reasonable diligence and retaliation claims related to the filing of the instant Action that were first alleged in his motion papers.  (*See id.* at 27.)

On December 1, 2016, Plaintiff filed an Amended Complaint. (*See* Am. Compl.) Pursuant to the briefing schedule set by the Court on May 31, 2017, (*see* Mot. Scheduling Order (Dkt. No. 76)), Defendants filed their Motion To Dismiss the Amended Complaint and accompanying papers on June 30, 2017, (*see* Dkt. Nos. 77–80). On August 14, 2017, Plaintiff filed his Opposition papers. (*See* Dkt. Nos. 83–84.) After receiving an extension from the Court on August 15, 2017, (*see* Order (Dkt. No. 82)), Defendants filed a letter brief in Reply in lieu of a formal Memorandum of Law, (*see* Letter from Yan Fu, Esq., to Court (Aug. 29, 2017) (Dkt. No. 85)).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint, "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alterations and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alterations and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its

face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In addition, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Hendrix v. City of New York*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [his or her complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]."

*Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted); *see also Farzan v. Wells Fargo Bank, N.A.*, No. 12-CV-1217, 2013 WL 6231615, at *12 (S.D.N.Y. Dec. 2, 2013) (same), *aff'd sub nom. Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015).  In deciding a motion to dismiss a pro se complaint, it is appropriate to consider certain "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including "documents that a pro se litigant attaches to his [or her] opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted); *see also Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) (noting that a court may consider "factual allegations made by a pro se party in his papers opposing the motion" (italics omitted)).  However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law."  *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and internal quotation marks omitted)).

    B.  Analysis

        1.  Timeliness

Defendants argue that Plaintiff's retaliation claims against Jackson and Ortiz and his due process claims against Donahue and George remain time-barred.  (*See* Defs.' Mem. in Supp. of Mot. To Dismiss Am. Compl. ("Defs.' Mem.") 9–12.)  As the Court held in its September 30, 2016 Opinion, Plaintiff's claims, all brought pursuant to § 1983, are subject to a three-year

statute of limitations. (*See* Sept. 30, 2016 Opinion 12.) Accordingly, the Court determined that Plaintiff's retaliation claim against Jackson arose on September 18, 2011, and thus needed to be filed by September 18, 2014 to be timely. (*See id.* at 13.) Plaintiff's retaliation claim against Ortiz arose on October 20, 2011, and thus needed to be filed by October 20, 2014 to be timely. (*See id.*) The Court then considered the case law on when Plaintiff's due process claim accrued, and ultimately determined that "the best answer . . . is that Plaintiff's [due process] claims accrued on the last day of the final disciplinary hearing." (*Id.* at 15.) Thus, Plaintiff's due process claims accrued no later than March 7, 2012, and therefore needed to be filed by March 7, 2015, absent any applicable tolling doctrines. (*See id.* at 16.)

The Court then considered Court whether Plaintiff may be entitled to equitable tolling of the statute of limitations. (*See id.* at 16–28.) Ultimately, the Court concluded that Plaintiff was entitled to limited equitable tolling with respect to his due process claim arising out of the October 20, 2011 incident while actively exhausting his administrative remedies. (*See id.* at 17.) However, Plaintiff was not entitled to equitable tolling for his due process claim arising out of the September 18, 2011 incident or any of his retaliation claims. (*See id.* at 16–18.) In any event, tolling for the period while actively exhausting his administrative remedies could not make any of his claims timely. (*See id.* at 16–18.) The Court also rejected Plaintiff's argument that the statute of limitations was tolled pending the resolution of his Article 78 proceedings. (*See id.* at 19.) However, in considering the applicability of equitable tolling to Plaintiff's claims, the Court held that, "in the prison context, reasonable fear of retaliation may be sufficient to constitute extraordinary circumstances warranting equitable tolling, particularly if the person threatening retaliation is a defendant or another official who could be or was influenced by a defendant." (*Id.* at 25.) The Court found that Plaintiff had alleged sufficient facts that gave rise

to a reasonable fear of retaliation, (*see id.* at 26), but had failed to allege requisite facts that showed "he exercised reasonable diligence during the time he felt threatened," (*id.*).

Plaintiff seeks to toll the period between March 20, 2014—when he returned to Sing Sing—until November 10, 2014, dates wherein he alleges that he "reached out to his mental health providers at every session," and "explained the fear and anxiety he was experiencing from staff at Sing Sing." (Am. Compl 8.) Plaintiff was informed by an unidentified provider that this message would be "relay[ed] . . . to the Superintendent at their meetings." (*Id.*) At no point does Plaintiff allege that he personally sought out or contacted Superintendent Capra to seek protection from retaliation until November 10, 2014, the date upon which Plaintiff finally spoke with Superintendent Capra. (*See id.*) At this November 10, 2014 meeting, Plaintiff personally informed Superintendent Capra about "the constant harassment, threats, and fear . . . if he wrote a grievance . . . or filed a [§] 1983 Complaint." (*Id.*) According to Plaintiff, Capra said he was "made aware of the concerns through mental health," and encouraged Plaintiff, "to file his complaint . . . without fear of retaliation." (*Id.*)

Defendants argue Plaintiff's allegations remain insufficient to establish that he exercised the requisite amount of diligence throughout the 235-day period he seeks to toll. (*See* Defs.' Mem. 11.) As the Court has previously explained, "the party asserting that equitable tolling applies must have acted with reasonable diligence throughout the period he sought to toll," (Sept. 30, 2016 Opinion at 20 (quoting *Myers v. New York*, No. 14-CV-1492, 2016 WL 2636295, at *5 (N.D.N.Y. May 9, 2016) (alterations and internal quotation marks omitted)); *see also Iavorski v. United States I.N.S.*, 232 F.3d 124, 134 (2d Cir. 2000) ("[E]quitable tolling requires a party to pass with reasonable diligence though the period it seeks to have tolled." (alteration and internal quotation marks omitted)), and the burden of establishing the applicability of equitable

tolling rests with the Plaintiff, (*see* Sept. 30, 2016 Opinion at 20). Reasonable diligence, however, "does not require the maximum feasible diligence, only 'due,' or reasonable, diligence." *LoCascio v. United States,* 395 F.3d 51, 55 (2d Cir. 2005) (quoting *Wims v. United States,* 225 F.3d 186, 190 n.4 (2d. Cir. 2000); *see also Baldayaque v. United States*, 338 F.3d 145, 153 (2d Cir. 2003) ("The standard is not 'extreme diligence' or 'exceptional diligence,' it is *reasonable* diligence."). Moreover, the Court's inquiry is specific to the Plaintiff, in that the Court must ask whether Plaintiff, "act[ed] as diligently as reasonably could have been expected *under the circumstances*[.]" *Baldayaque*, 338 F.3d at 153.

Here, the Court finds that Plaintiff did not act with reasonable diligence under the circumstances. Plaintiff argues, "the average prisoner . . . may not see him for months, maybe years, depending on when he makes rounds," and that even if he were to write to Capra, "[he] may not get a response." (Decl. in Supp. of Pl.'s Opp'n to Mot. To Dismiss ("Pl.'s Decl.") 3 (Dkt. No. 84).) However, Plaintiff does not allege that he was incarcerated in a more restrictive unit than general population, nor does he allege that he was in fact limited in his ability to contact Capra himself, only that he did not think it would generate a response. (*See id.*) Instead, Plaintiff relied upon the actions of others, namely his mental health provider, to seek out Capra for him, and never undertook any effort himself to speak with Capra until November 10, 2014. This is not sufficient. *See Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 81 (2d Cir. 2003), *as amended* (July 29, 2003) (holding that "[the] [p]laintiff failed to act diligently when she did not pursue the filing of a formal complaint"); *Nash v. McGinnis,* No. 04–CV–9496, 2005 WL 1719871, at *4 (S.D.N.Y. July 22, 2005) (denying equitable tolling in habeas context where "[p]etitioner [made] *no specific allegations* explaining . . . what efforts he made" to vindicate his rights). There is no allegation that any Defendant took any action that prevented

Plaintiff from contacting Capra himself for 235 days, and thus Plaintiff failed to contact Capra and seek assistance himself not due to any action taken by the Defendants, but due to his own failure to exercise reasonable diligence. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (finding that "[t]here is no allegation that any defendant took any action" that prevented the plaintiff from uncovering the alleged fraud, and thus holding that "[t]he ineluctable conclusion is that [the plaintiff] failed to file his claim within the statute of limitations not due to the defendants' fraudulent concealment, but due to his own failure to exercise reasonable diligence.")

Perhaps more importantly, Plaintiff does not specify how frequently he met with his mental health providers beyond alleging that he spoke of his fear at "every session" between March 20, 2014 and November 10, 2014. (Am. Compl. ¶ 31.) Yet, "every session" could mean that Plaintiff raised this once at the one session he had—which would be insufficient—or that he raised it every day at daily sessions during the intervening 235 days. *Cf. Lee v. Portuondo,* No. 02–CV–3990, 2003 WL 22173078, at *2 (E.D.N.Y. Aug. 29, 2003) (concluding that three attempts to obtain requisite materials for a claim in the one-year limitations period did not constitute a diligent effort); *Lewis v. Walsh,* No. 03–CV–1932, 2003 WL 21729840, at *3 (S.D.N.Y. July 25, 2003) (holding that sending "sporadic" letters requesting documents, written "with lengthy delays between each letter," was not a sufficiently diligent effort). Evaluating the amount of effort put forth is a critical component of the diligence inquiry, and the lack of allegations regarding what efforts were taken is fatal to Plaintiff's claim. *See Diaz v. Kelly,* 515 F.3d 149, 154 (2d Cir. 2008) ("[T]he diligence requirement of equitable tolling imposes . . . a substantial obligation to make all reasonable efforts to obtain assistance."); *Hengjin Sun v. China 1221, Inc.*, 12–CV–7135, 2015 WL 5542919, at *7 (S.D.N.Y. August 12, 2015) (refusing to

apply equitable tolling where the plaintiffs "failed to offer any evidence to demonstrate that they diligently pursued their claims prior to filing or joining th[e] lawsuit" (emphasis omitted)); *Quezada v. Capra*, No. 13-CV-8574, 2015 WL 2130217, at *2 (S.D.N.Y. May 6, 2015) (holding that equitable tolling is not applicable where the "description of [the] efforts to pursue assistance within the prison [are] vague" and include "no details as to what efforts [were] made" (internal quotation marks omitted)). Because Plaintiff has failed to allege with the requisite specificity when and how frequently he sought assistance, the Court cannot ascertain from the allegations "what steps [Plaintiff] took to secure the superintendent's assurance that he would not be retaliated against," nor can the Court determine "when he took those steps." (Sept. 30, 2016 Opinion 27.) Accordingly, the Court concludes that, on the facts alleged, Plaintiff has failed to allege he exercised reasonable diligence during the relevant time period, and therefore his retaliation claims and due process claims against Ortiz, Jackson, Donahue, and George are dismissed.[5]

### 2. Collateral Estoppel

Even if Plaintiff's due process claims were not time barred, he is collaterally estopped from asserting them here. Collateral estoppel, also known as issue preclusion, provides that "when an issue of ultimate fact has once been determined by a valid and final judgment, the issue cannot again be litigated between the same parties in any future lawsuit." *Swiatkowski v.*

---

[5] As Defendants note, even if Plaintiff was entitled to equitable tolling of the statute of limitations for the 235-day period between March 20, 2014 and November 10, 2014, his retaliation claims against Jackson and Ortiz remain time-barred. (*See* Defs.' Mem. 12.) Adding the 235 days, the claim would be tolled to the date the statute of limitations expired, Plaintiff's claim against Jackson would have to have been filed by May 11, 2015, while his claim against Ortiz needed to be filed by June 12, 2015. Because Plaintiff filed this Action on June 29, 2015, each of Plaintiff's retaliation claims would be time barred even with the application of equitable tolling.

*Citibank,* 745 F. Supp. 2d 150, 168 (E.D.N.Y. 2010) (internal quotation marks omitted), *aff'd,* 446 F. App'x 360 (2d Cir. 2011); *see also Tracy v. Freshwater,* 623 F.3d 90, 99 (2d Cir. 2010) ("Collateral estoppel precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party." (internal quotation marks omitted)).  Federal courts must give the same preclusive effect to state court judgments as would be given by courts of the state itself, *see Hayes v. Cty. of Sullivan,* 853 F. Supp. 2d 400, 424 (S.D.N.Y. 2012), which means that New York law governs the preclusive effect of a prior Article 78 judgment on a § 1983 action in federal court, *see Ortiz v. Russo*, No. 13-CV-5317, 2015 WL 1427247, at *6 (S.D.N.Y. Mar. 27, 2015).  Accordingly, collateral estoppel will preclude a court from deciding an issue where "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *McKithen v. Brown,* 481 F.3d 89, 105 (2d Cir. 2007) (internal quotation marks omitted); *see also Hayes,* 853 F. Supp. 2d at 425 (same).

"The party asserting issue preclusion bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir. 1995); *see also Thomas v. Venditto,* 925 F. Supp. 2d 352, 360 (E.D.N.Y. 2013) (same).  Typically, collateral estoppel is "pled as [an] affirmative defense[] and thus . . . will [not] serve as the basis for a pre-answer motion to dismiss." *Magi XXI, Inc. v. Stato Della Città Del Vaticano,* 22 F. Supp. 3d 195, 201 (E.D.N.Y. 2014).  It is, however, "well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.

1998).  Therefore, the defense "may be brought, under appropriate circumstances, via a motion to dismiss."  *Thomas v. N.Y.C. Dep't of Educ.*, 938 F. Supp. 2d 314, 331 (E.D.N.Y. 2013) (alteration and internal quotation marks omitted).  Because it is well established that, "a judgment in an Article 78 proceeding precludes relitigation of those issues already decided in that judgment," *Watkins v. Annucci*, No. 02-CV-4475, 2006 WL 722005, at *4 (S.D.N.Y. Mar. 22, 2006), the Court deems this to be an appropriate circumstance to evaluate a claim of issue preclusion, *see, e.g.*, *Lawtone-Bowles v. City of N.Y., Dep't of Sanitation*, 22 F. Supp. 3d 341, 349 (S.D.N.Y. 2014) (applying collateral estoppel where "[t]he issues underlying the plaintiff's . . . claims [were] . . . identical to issues that were actually and necessarily decided in the plaintiff's Article 78 proceeding"); *Watkins*, 2006 WL 722005, at *4 (applying collateral estoppel on a motion to dismiss where, "[t]he issues raised by [the] [p]laintiff are nearly identical to those raised in his Article 78 proceeding").

The identical due process defects that Plaintiff now brings before the Court were all raised and decided in his prior Article 78 proceedings.  As to the George Hearing, Plaintiff's Amended Complaint alleges that he was denied access to a "copy of the video/audio tape" of the incident, as well as access to the drug testing manual.  (Am. Compl. ¶ 14.)  Plaintiff also alleges that George was biased, (*see id.* ¶ 13), and that Plaintiff was denied the opportunity to call as witnesses "his Urologist, his Kidney Specialist, the Nurse Administrator, [and] the Mental Health Unit Chief," (*id.* ¶ 14).

In his first Article 78 proceeding, Plaintiff alleged that George, "deprived [Plaintiff] of [his] . . . right to present evidence . . . when [George] denied [him] video/audio evidence," (Apr. 9 Davis Article 78 Petition ¶ 12), and access to the "drug testing manual," (*id.* ¶ 16).  Plaintiff further alleged that George, "deprived [Plaintiff] of . . . [his] constitutional right to witnesses,"

when he denied him the opportunity to call his "urology and kidney specialist[s]," (*id.* ¶ 11), as well as the Nurse Administrator and mental health unit chief as witnesses, (*id.* ¶ 13). Plaintiff also directly challenged George's impartiality as a hearing officer, alleging that he was biased due to his direct involvement in the proceedings given that he "approved the urine test." (*Id.* ¶ 15.) The state court expressly dismissed each of these allegations, holding that "[t]he errors cited by [Plaintiff] [did] not constitute a denial of due process." *Matter of Davis v. Fischer*, No. 200/12 at 3 (N.Y. Sup. Ct. Dec. 20, 2012). As to the witnesses specifically, the court found that "denial of those witnesses was appropriate," (*id.*), and further held on Plaintiff's evidentiary claims that the decision was supported by "substantial evidence," (*id.*)

Plaintiff also brings claims as to the hearing before Donahue, alleging that his due process rights were violated because his request to call C.O. Bonner and C.O Jackson as witnesses was denied, (*see* Am. Compl. ¶¶ 18–19), and that Donahue exhibited bias during the proceedings by stating that he did not believe Plaintiff and allegedly using a racial slur, (*see id.* ¶ 21).

In his second Article 78 proceeding, Plaintiff made the same claims, asserting that he was denied due process on the grounds that Donahue "deprived [him] of [his] constitutional right to witnesses when he denied C.O. Bonner and C.O. Jackson[] as [his] witnesses," (Aug. 3 Davis Article 78 Petition ¶ 10), and that Donahue was "biased," and provided ineffective assistance, (*id.* ¶¶ 11–12). The state court squarely rejected these claims, finding no due process violations and holding that the requested witnesses "would not have been relevant to the issue of [Plaintiff's] guilt," *Matter of Davis v. Fischer*, No. 520/12 at 3 (N.Y. Sup. Ct. Jan. 17, 2013), and that Donahue was "not biased and did not deprive [Plaintiff] of effective assistance," *Id.*

Therefore, not only did Plaintiff raise each of his discrete due process claims in the Article 78 proceedings, but in both instances, the state court necessarily rejected his claims by concluding on the merits that Plaintiff had not met his burden of establishing that the procedures used, or subsequent outcome, of either hearing constituted a violation of Plaintiff' due process rights. Courts have applied the collateral estoppel doctrine in precisely this context to dismiss similar claims. *See, e.g.*, *Olutosin v. Lee*, No. 14-CV-685, 2016 WL 2899275, at *6 (S.D.N.Y. May 16, 2016) (applying collateral estoppel when the allegations in the amended complaint "[we]re the very issues that were the subject of the Article 78 Proceeding and were already considered and decided by the state courts in that proceeding"); *Vann v. Fischer*, No. 11-CV-1958, 2014 WL 4188077, at *26 (S.D.N.Y. Aug. 25, 2014) ("[The] [p]laintiff is precluded from litigating the issues of [a defendant's] hearing testimony and [the hearing officer's] bias . . . because they were raised in his Article 78 proceeding.").

Plaintiff does not attempt to argue that he was denied a full and fair opportunity to litigate these issues. Nor could he, as any such arguments would plainly lack merit given that Plaintiff submitted a petition supported by exhibits, as well as a reply to the opposition papers. *See Ortiz*, 2015 WL 1427247, at *7 (finding an assertion "that [the plaintiff] was not given a full and fair opportunity to litigate the claims in the prior [Article 78] proceeding . . . would be without merit, given that he submitted a petition supported by exhibits, as well as a reply to the respondents' opposition papers"); *Fortunatus v. Clinton Cty.,* 937 F. Supp. 2d 320, 332 (N.D.N.Y. 2013) (concluding that "[the plaintiff] cannot gainsay that he had a full and fair opportunity to litigate his claims" where, "[i]n addition to his lengthy petition, [the plaintiff] submitted sworn affidavits, exhibits, and a memorandum of law in support of his claims, all of which would substantiate a full opportunity to litigate"); *Carroll v. Callanan,* No. 05-CV-1427, 2008 WL

170204, at *3 (N.D.N.Y. Jan. 16, 2008) (holding that "[the plaintiff] had a full and fair opportunity to [litigate] . . . by raising the issues . . . in multiple documents submitted during the course of his Article 78 proceeding").

Accordingly, because Defendants have established that Plaintiff's due process claims as to George and Donahue were decided in the respective Article 78 hearings, and Plaintiff has not sustained his burden of establishing the lack of an adequate opportunity to litigate in the prior proceedings, collateral estoppel applies to his due process claims. As such, the claims against George and Donahue are dismissed.[6]

### 3. Retaliation Claims from 2014 to 2015

Plaintiff's Amended Complaint alleges that Grant retaliated against Plaintiff by filing false misbehavior reports on or about March 20, 2014, and again on or about October 31, 2015. (*See* Am. Compl. ¶¶ 27, 40.) Plaintiff also alleges that Paroline engaged in retaliatory conduct by first cutting and confiscating Plaintiff's belt and buckle on August 4, 2015, and then stating that Plaintiff was suicidal and writing up a misbehavior report. (*See id.* at ¶¶ 36–39.) The Court will address each of these claims in turn.

A plaintiff asserting a First Amendment retaliation claim must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."

---

[6] To the extent Plaintiff claims that Jackson's, Ortiz's, or Shibah's filing of allegedly false misbehavior reports constitute a due process violation, those allegations do not constitute a due process claim. *See Benitez v. Ham*, No. 04-CV-1159, 2009 WL 3486379, at *21 (N.D.N.Y. Oct. 21, 2009) ("[A] correctional officer's filing of unfounded charges does not give rise to procedural due process liability." (citing *Freeman v. Rideout*, 808 F.2d 949, 953–54 (2d Cir. 1986)); *see also Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *10 (S.D.N.Y. Aug. 28, 2017) (same). Thus, any due process claims purportedly brought against Jackson, Ortiz, and Shibah are also dismissed.

*Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks omitted). Courts are instructed to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official . . . can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted). Accordingly, First Amendment retaliation claims brought by prisoners must "be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.'" *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)).

### a. Grant

Grant contends that Plaintiff has failed to plausibly state a constitutional claim of retaliation as to the March 2014 misbehavior report, because Plaintiff has failed to allege that Grant's conduct, "was in response to any protected speech or conduct." (Defs.' Mem. 19.) The Court agrees.

Plaintiff's allegation is that Grant wrote him up after stating that Plaintiff was "the inmate who assaulted Jackson because of that I.L.C. bullshit." (Am. Compl. ¶ 27.) Plaintiff does not allege that he was engaged in any protected activity at the time, such as filing a grievance, nor does he allege that Grant's reaction was in response to such protected speech. Rather, Plaintiff's retaliation claim hinges on Grant's reaction to Plaintiff's prior assault on Jackson, which is clearly not protected activity. *See Jackson v. Dzurenda*, No. 11-CV-1668, 2012 WL 5448330, at *2 (D. Conn. Nov. 7, 2012) ("An inmate's assault on an officer plainly does not constitute protected activity.") As to the October 31, 2015 misbehavior report, Plaintiff alleges that this was done by Grant in response to him being found not guilty of the prior March 2014 charge.

(*See* Am. Compl. ¶ 40.)  Here too, Plaintiff has failed to identify any protected speech or conduct

that was the catalyst for this retaliation.  Being found not guilty does not qualify as "protected

activity, or for that matter, 'activity' at all."  *Taylor v. Fischer,* 841 F.Supp.2d 734, 737

(W.D.N.Y. 2012); *see also Weathers v. Uhler*, No. 12-CV-0982, 2014 WL 1056947, at *8

(N.D.N.Y. Mar. 18, 2014) (same).

### b.  Paroline

Plaintiff alleges that Paroline said he had heard that Plaintiff "like[s] suing people," prior

to taking his allegedly retaliatory action of confiscating Plaintiff's belt, calling Plaintiff suicidal,

and filing a false misbehavior report.  (Am. Compl. ¶¶ 36–39.)  Construing Plaintiff's allegations

liberally, as the Court must, it appears that Plaintiff alleges Paroline's actions were in response to

Plaintiff commencing the instant Action.  This is clearly a protected activity.  *See Vasquez v.

Rockland Cty.*, No. 15-CV-8912, 2017 WL 456473, at *5 (S.D.N.Y. Feb. 1, 2017) ("The filing of

lawsuits or prison grievances is a constitutionally protected activity." (internal quotation marks

omitted)); *Baskerville v. Blot*, 224 F. Supp. 2d 723, 731 (S.D.N.Y. 2002) ("[T]he filing of a

lawsuit is a constitutionally protected activity.").

While Plaintiff has adequately alleged that he engaged in protected conduct, the Court is

not necessarily convinced that the taking of the belt or placement on suicide watch rises to the

level of an "adverse action" against him.  An action qualifies as an "adverse action" for purposes

of a retaliation claim only if the action would "deter a prisoner of ordinary firmness from

vindicating his or her constitutional rights through the grievance process and the courts."  *Gill v.

Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004); *see also Muhammad v. Jenkins*, No. 12-CV-8525,

2013 WL 5225573, at *9 (S.D.N.Y. Sept. 13, 2013) (same).  The one-time taking of Plaintiff's

belt is a de minimis action and does not constitute an adverse action.  *See Fann v. Arnold*, No.

14-CV-6187, 2016 WL 2858927, at *2 (W.D.N.Y. May 16, 2016) (holding that the plaintiff's allegation of property destruction "constitute[d] a de minimis act of retaliation" where the plaintiff had alleged that "all of his property was thrown in the shower"). Nor does Plaintiff's placement on suicide watch constitute an adverse action under the circumstances, given the Amended Complaint's own admissions regarding Plaintiff's suicidal tendencies and placement on suicide watch mere months prior to this interaction. (*See* Am. Compl. at 9); *see Mateo v. Fischer*, 682 F. Supp. 2d 423, 434–35 (S.D.N.Y. 2010) (holding that a plaintiff's past mental health issues could lead a reasonable person to believe a referral to a mental health office was justified and not an adverse retaliatory action); *see also Abascal v. Jarkos,* 357 F.App'x 388, 391 (2d Cir. 2009) (finding a plaintiff's claim that he was arbitrarily classified as mentally ill and transferred to a psychiatric center was not an adverse action because the complaint substantiated that classification).

On the other hand, Paroline's filing of allegedly false misbehavior reports would constitute an adverse action. *See Gill,* 389 F.3d at 384 (filing a false misbehavior report was an adverse action for purposes of retaliation analysis). Furthermore, Plaintiff has alleged sufficient facts showing "a causal connection between the protected conduct and the adverse action," *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (alteration and internal quotation marks omitted). "As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden,* No. 09-CV-3135, 2011 WL 1453789 at *4 (S.D.N.Y. Apr. 14, 2011); *see also Wright v. Goord,* 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about a prior incident by another correctional officer). Here, Plaintiff does not allege that Paroline was party to his lawsuit when filed on July 7, 2015, and Paroline

was not named as a Defendant until the filing of the Amended Complaint on June 30, 2017. *See*

*Jones v. Fischer*, No. 10-CV-1331, 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013)

(dismissing the plaintiff's retaliation claims and noting such claims "have been dismissed when

they are supported only by conclusory allegations that the retaliation was based upon complaints

against another officer"); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011)

(finding the plaintiff failed to provide any basis to believe that a defendant would retaliate for a

grievance in which the defendant was not named). However, Paroline's alleged comment that

Plaintiff "like[s] suing people," (Am. Compl. ¶ 36), uttered immediately prior to his filing of the

first misbehavior report, indicates a plausible retaliatory animus. *See Baskerville,* 224 F. Supp.

2d at 733 (finding that "[a defendant's] alleged comment during the assault[,] 'you want to file

lawsuits and grievances, you're nothing but a coward[,]' [] points to a retaliatory animus," and

that "[s]imilarly, [a defendant's] alleged statement to plaintiff[,] 'I should have fucked you up the

minute you entered the unit[,]' [] is circumstantial evidence of retaliatory intent"); *Vincent v.*

*Sitnewski*, 117 F. Supp. 3d 329, 338–39 (S.D.N.Y. 2015) (noting that while "as a general matter,

it is difficult to establish retaliation by one officer for complaints against another officer," the

general rule may not apply where there are indications of "a retaliatory purpose—*i.e.,* that the

[officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to

dissuade future grievances" (alterations and internal quotation marks omitted)). Moreover, the

one month proximity between the filing of this Action and the misbehavior reports, as well as

Plaintiff's lack of guilt for the charges filed by Paroline, provide additional circumstantial

evidence that make plausible Plaintiff's retaliation claim at this stage. *See Spavone v. Fischer*,

No. 10-CV-9427, 2012 WL 360289, at *5 (S.D.N.Y. Feb. 3, 2012) ("[A] causal connection may

be established by the temporal proximity between an inmate's lawsuit and an adverse action . . .

and vindication in a proceeding arising from the alleged retaliation." (citing *Colon*, 58 F.3d at 873)). Accordingly, Plaintiff's retaliation claims as to Paroline for the filing of the false misbehavior reports on August 4, 2015 and August 8, 2015 survive the instant Motion.

## III. Conclusion

For the foregoing reasons, Defendants Motion is granted in part and denied in part. Plaintiff's retaliation and due process claims against Jackson, Ortiz, Shibah, Donahue, George, and O'Cana are dismissed with prejudice as time-barred and collaterally estopped. Plaintiff's retaliation claim against Grant is also dismissed, but, because this is the first adjudication of Plaintiff's claim against Grant on the merits, that claim is dismissed without prejudice. If Plaintiff wishes to file an Amended Complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of this Opinion & Order. Plaintiff is advised that a second amended complaint would replace, and not supplement, the prior complaint. Accordingly, Plaintiff should include all allegations he wants to include against the Defendants remaining in this case. Defendants' Motion is denied as to the retaliation claims against Paroline.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 77), and to mail a copy of this Opinion & Order to Plaintiff's address listed on the docket.

SO ORDERED.

Dated: January ⧗ , 2018
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

29